EILEEN BOECHE, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

37 N. W. 2d 593

Filed May 19, 1949. No. 32566.

*James F. Begley* and *Lloyd E. Peterson,* for plaintiff in error.

*James H. Anderson,* Attorney General, and *William T. Gleeson,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

Eileen Boeche, hereinafter referred to as defendant, was charged with the crime of uttering and publishing two bank checks as true and genuine when in fact they were false or forged instruments. She was convicted and sentenced to serve a term in the Nebraska Reformatory for Women. She prosecutes error to review the record of her conviction.

It appears from the record that the cashier and filing clerk of Soennichsen's Mercantile Store located at Plattsmouth, Nebraska, returned to her duties at 7:15 p. m., December 20, 1947. This witness testified that at that time a saleslady was present in the office who took care of the same in her absence. Between 7:30 and 8 p. m., a customer whom she later identified as the defendant was in the office and the saleslady had a check which was dated December 19, 1947, made payable to the order of Barbara Hale in the amount of $46.75, signed by Ann Mangel. A notation appears in the lower left-hand corner of the check, "Ann's Dress Shop, Nebr. City, Nebr." The saleslady presented the check to the cashier to be cashed. The cashier asked the defendant where she got the check, to which the defendant replied that it was a salary check for work done in Ann's Dress Shop at Nebraska City. The cashier then asked her if she knew a Dorothy Zimmerman at Nebraska City. She did not know such person. The check was then cashed. This witness was not positive that she saw the defend-

ant endorse the check. The check was taken to a bank the following Monday and was returned for the reason that it was a false and fraudulent check and no such party or place of business existed in Nebraska City as appeared thereon. The cashier then gave the bank the amount of the check, $46.75. This witness further testified that at the time of the transaction the defendant was wearing either a black or navy blue coat of soft wool material. She did not know what kind of a hat the defendant wore. The saleslady who received the check identified the defendant as the person who gave it to her, and corroborated the cashier's testimony.

The sheriff of Otoe County, who was also the chief of police of Nebraska City, testified that there is no such place of business in Nebraska City as Ann's Dress Shop; and that he has known and been acquainted with the defendant who has resided in Nebraska City for 10 or 12 years.

The cashier of the Otoe County National Bank, the bank upon which the checks in this case were drawn, testified that he was not acquainted with an Ann Mangel, a Barbara Hale, nor the defendant; that there was no such place of business in Nebraska City as Ann's Dress Shop; and that the bank had no account in the name of Ann Mangel.

The manager of the Ladies Toggery since 1919, a store in Plattsmouth, testified he saw a customer whom he later identified as the defendant in the store between 8:30 and 9 p. m., on December 20, 1947, at the time he was waiting on a customer and the defendant was standing in about the middle of the store. A saleslady gave him a check presented by the defendant in payment for some merchandise, for him to O. K. This check is identical in the handwriting and in the amount as the check previously described, with the same payee and the same maker. The only difference is in the number. This witness asked the defendant if this was her check and she said it was and that she received it for working

in Ann's Dress Shop. He then asked her for her social security number as identification. She said she was sorry, she had lost it the day previous. She had a pass book, opened it, and it showed deposits. The manager did not notice the name on the pass book. He told the defendant he did not know any dress shop in Nebraska City by that name, Ann's Dress Shop. She said it had been there for some time. He did not see the defendant endorse the check. The bank returned the check for the reason it was a false and fraudulent check, and the store returned the amount of $46.75 to the bank. The defendant had on a black coat and a small hat on the back of her head.

The saleslady who sold the merchandise to the customer who has been identified as the defendant, failed to identify her, but remembered the transaction with reference to the check and the conversation between the manager of the store and the customer as related by him, and corroborated his testimony in such respect.

The witness Louis Boeche testified that he was a mechanic junior grade in the Army Engineers and had been so employed for a period of two months prior to the time of the trial; before that time he was a sheet-metal worker with the Bell Gas Appliance Company located at Nebraska City; that he had known the defendant almost a year, and was married to her on December 24, 1947; that on the evening of December 20, 1947, he left his work at approximately 6:15 p. m., went home, took a bath, shaved, and sat down to lunch at 6:45 p. m., and that the defendant was with him. He was living at his mother's home. They were going to shop for shoes for him, and left his mother's house about 7:20 p. m. They walked up town in Nebraska City, going directly to Homeyer's Shoe Store, where he bought a pair of shoes and was waited on by one Jack Hall. The defendant was with him at the time. He told the defendant that he was going to pick out the shoes himself, and she was to say nothing about them, so while he and

Hall, the clerk, were talking, Hall asked the defendant why she did not say anything and if she had laryngitis because she was not talking. She informed him that she was to say nothing about the shoes. This witness and the defendant left the shoe store to go to a bakery and cafe a short distance from the shoe store where they had a cup of coffee and a sandwich, and here the defendant called her mother with reference to some ribbon for Christmas decorations for the front door. They were in the cafe at least 20 minutes. From the cafe they proceeded to the Dammast Clothing Store where about a week prior this witness had purchased a suit. The pants had been taken to the store to be shortened, and he was to pick them up before closing time on this evening. This was about 8:30 p. m., and the defendant was with him. He and the defendant then left the clothing store and went to the Arbor Theater, and she was carrying some packages. They sat in front of a Mr. and Mrs. Harvey Mead who resided at Sidney, Iowa. There was a serial playing, and Harvey Mead wanted to see it the second time. There was some conversation with reference to the matter. This witness and the defendant left the Arbor Theater at 11:15 p. m., and took a taxi. He went to his home and the defendant went to her home. The effect of the testimony of this witness was that the defendant was with him from 6:30 until 11:15 on the night of December 20, 1947.

Jack Hall, the shoe clerk, testified that he saw Louis Boeche and the defendant in the shoe store on the evening in question around 8 o'clock. On cross-examination he refused to say positively that on December 20, 1947, he sold a pair of Air-O-Magic shoes to Louis Boeche. Such a pair of shoes was sold that Saturday night, but he would not say they were sold to Louis Boeche.

Harvey Mead testified that on the evening in question he was in the Arbor Theater with his wife and saw Louis Boeche and the defendant come to the picture show between 8:30 and a quarter till nine, and that the

defendant had some packages which she was carrying.

The defendant's father testified that he was a civil engineer with the Army Engineers and had been so employed for 26 years; that on the evening in question he took the defendant to the Meredith residence, Mrs. Meredith being Louis Boeche's mother, at about 6 p. m., and that the defendant came home that evening at approximately 11:30 p. m. He fixed the date because he was preparing to decorate a Christmas tree the following day.

Mary Ann Meredith testified that she is the mother-in-law of the defendant, and that the defendant came to her house for dinner just after 6 p. m., on the evening in question. She left her home about 7 p. m., that evening, and the defendant was still at the house.

Betty Ruth Mead testified that she is acquainted with the defendant and saw her on the evening in question when she sat in front of the witness and her husband at the Arbor Theater, and that Louis Boeche and the defendant came into the theater about a quarter till nine.

Wilson Sigerson, Jr., testified that in December 1947, he was employed on Saturdays at the Dammast Clothing Store, and saw the defendant and her husband in the store between 8 and 9 o'clock that evening. It could not have been as late as 9:30 p. m., for the reason the store closes at 9 p. m. He was not positive as to the date.

Louis E. Harris testified that he is a resident of Lincoln; that for 15 years he has been a chemist and scientific criminologist with the degree of master of science and postgraduate work for the degree of doctor of philosophy. In the field of questioned documents, he had studied the texts, followed the work from a practical standpoint, examined many questioned documents, and testified in some cases in Nebraska. His evidence was admitted without objection by the State. There are several exhibits in evidence which were written by the defendant in the presence of the jury, and other

exhibits which constituted the handwriting of the defendant prior to her arrest, for the purpose of comparison of handwriting. The witness testified that in his opinion the endorsements appearing on the two checks in question were not made by the defendant.

The defendant's mother testified that she received a telephone call from the defendant at about 8 o'clock on the evening in question, when the defendant was down town in Nebraska City. She states the time by virtue of a radio program which she listened to.

The defendant testified that she was with Louis Boeche from 6 p. m. on, during the evening in question, and her testimony is in exactitude with that of the witness Louis Boeche.

Jack Knudtson testified that he is a criminal investigator for the Nebraska Safety Patrol, had worked in that capacity for a year prior to the time of the trial, and had been connected with the patrol for eight years; that he is known as a polygraph operator, and is engaged in the process of setting up a criminal laboratory for the state; that a polygraph machine, commonly referred to as a lie detector, is one that makes many recordings, such as the increase and decrease of blood pressure. It is also a galvanometer that records the increase and decrease of perspiration, and also a munograph that records respiration and inhalation and expiration of breath. He described the machine and the manner in which it makes the recordings, and testified that the defendant voluntarily submitted to certain tests. The defendant then offered the witness to testify to and prove the results of the tests so made which would show a normal reaction to all the questions propounded with reference to the commission of the offenses charged, and indicate that the defendant was not guilty of such offenses. Objection was made to the competency of such evidence and was sustained, we believe properly so for the reasons hereinafter given.

The trial court gave an instruction which contained

the following language: "Yet, you have no right to reject the testimony of any of the witnesses without good reason, and you should not do so until you find it irreconcilable with other testimony which you may find to be true."

The writer of this opinion joined in a concurrence in the case of Schluter v. State, *ante* p. 284, 37 N. W. 2d 396, that such language contained in an instruction is prejudicially erroneous in all civil and criminal cases and requires a reversal of any such case. The majority opinion in the afore-cited case announces the rule that an instruction containing such language is held to be erroneous and ordinarily prejudicial. We must conclude from the factual situation above detailed that an instruction containing the language as heretofore set out in this case is prejudicially erroneous and requires a reversal and remand of the cause for further proceedings.

The trial court gave instruction No. 13 as follows: "You are instructed that one of the defenses interposed by the defendant in this case is what is commonly known as an alibi; that is, that the defendant was at another place at the time of the alleged commission of the crimes. The Court instructs you, the jury, that such defense is as proper and legitimate, if proven, as any other, and all evidence bearing on that point should be carefully considered by the jury. If, in view of all the evidence, you, the jury, have a reasonable doubt as to whether the defendant was in some other place when the crime was committed, you should give the defendant the benefit of the doubt and find her not guilty. As regards the defense of an alibi, the jury are instructed that the defendant is not required to prove that defense beyond a reasonable doubt to entitle her to an acquittal on either or both of the counts of the amended information. It is sufficient if the evidence raises a reasonable doubt of her presence at the time and place of the commission of the crimes charged in the counts of the amended information filed herein."

The defendant contends that the district court erred in giving the foregoing instruction, for the reason that the instruction placed the burden of proof to establish an alibi on the defendant by the use of the words "if proven," and by the further language in the instruction, "the defendant is not required to prove that defense beyond a reasonable doubt to entitle her to an acquittal * * *."

An instruction on the defense of an alibi similar to the one given in the case at bar has been approved by this court in McLain v. State, 18 Neb. 154, 24 N. W. 720, and in Huckett v. State, 121 Neb. 364, 237 N. W. 159. In view of all the instructions given, and by analyzing the authorities with reference to the language "if proven" as appears in the instruction, the same was not prejudicially erroneous in the instant case. However, the phrase "if proven" is subject to criticism and we do not approve its use and believe that this phrase should be eliminated in the future in any instruction on an alibi, or any other language appearing in the instruction that might indicate the shifting of the burden of proof on the defense.

This brings us to the assignment of error where the trial court refused to admit evidence of the results of tests made on the defendant by the use of a polygraph, commonly known and referred to as a lie detector, to which the defendant voluntarily submitted.

We have heretofore set forth the qualifications and study made by the officer in charge of the giving of tests on the polygraph in behalf of the Nebraska Safety Patrol.

In the following reported cases the courts have generally rejected such tests on the ground that their reliability has not yet been fully established.

In People v. Forte, 279 N. Y. 204, 18 N. E. 2d 31, 119 A. L. R. 1198, in speaking of a polygraph or lie detector, the court said that the court may not take judicial notice that such an instrument is or is not ef-

fective for examining the truth, and, until the fact be demonstrated by qualified experts, it cannot be said, as a matter of law, that the trial court erred in denying the motion to reopen a case to have the defendant submit to an examination by the polygraph.

Cogent reasons in support of this attitude readily suggest themselves. In the first place, the vital function of cross-examination would be impaired. The operator, appearing as a witness to report and interpret the results of the test, might be questioned as to his qualifications, experience, his methods, and on similar matters, and that is about all. But the machine itself—conceding the comparatively high percentage record as to accuracy and reliability claimed for it—escapes all cross-examination. There is no persuasive analogy here with such tests as fingerprinting which have a strictly physical basis, clearly demonstrable. It is not contended that the lie detector measures or weighs the important psychological factors. Many innocent but highly sensitive persons would undoubtedly show unfavorable physical reactions, while many guilty persons, of hardened or less sensitive spirit, would register no physical indication of falsification. This the trained operators of course understand, and proceed upon the basis of a large percentage of error. But it seems quite too subtle a task of evaluation to impose upon an untrained jury. See State v. Lowry, 163 Kan. 622, 185 P. 2d 147. See, also, annotations in 139 A. L. R. 1174, 34 A. L. R. 147, 86 A. L. R. 616, 119 A. L. R. 1200; Frye v. United States, 54 App. D. C. 46, 293 F. 1013, 34 A. L. R. 145; State v. Bohner, 210 Wis. 651, 246 N. W. 314, 86 A. L. R. 611; State v. Cole, 354 Mo. 181, 188 S. W. 2d 43, 189 S. W. 2d 541.

It is apparent from the foregoing authorities that the scientific principle involved in the use of such polygraph has not yet gone beyond the experimental and reached the demonstrable stage, and that it has not yet received general scientific acceptance. The experimenting psy-

chologists themselves admit that a wholly accurate test is yet to be perfected.

We conclude the trial court did not err in rejecting this evidence.

Other assignments of error need not be discussed.

For the reasons herein given, the judgment is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

CHAPPELL, J., concurring.

I concur in the result. However, I do not agree with that part of the opinion holding that as a matter of law the so-called polygraph or lie detector, here involved, "used for determining the truthfulness of testimony has not yet gained such standing and scientific recognition as to justify the admission of expert testimony deduced from tests made under such theory."

The history of such physiological or psychological deception tests, its progressive development, scientific efficiency, and the question of the admissibility thereof, particularly in criminal cases, will be found in 34 A. L. R. 145, 86 A. L. R. 611, 119 A. L. R. 1198, 139 A. L. R. 1171, together with the respective annotations thereto, and supplemental decisions to date.

It will be noted that the first case, reported as Frye v. United States, 54 App. D. C. 46, 293 F. 1013, 34 A. L. R. 145, decided December 3, 1923, involved defendant's offer of an expert witness to testify concerning the result of a simple systolic blood pressure deception test made upon him prior to trial. The government's objection thereto was sustained, upon the basis that such a test "for determining the truthfulness of testimony has not yet gained such standing and scientific recognition as to justify the admission of expert testimony deduced from tests made under such theory."

Defendant therein was convicted, and upon appeal therefrom the court said: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Some-

where in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be' sufficiently established to have gained general acceptance in the particular field in which it belongs.

"We think the systolic blood-pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made."

State v. Bohner, 210 Wis. 651, 246 N. W. 314, 86 A. L. R. 611, decided January 10, 1933, involved the rejection of an offer by defendant of like evidence involving a like test, to prove an alibi for defendant. Therein, after citing and quoting from Frye v. United States, *supra,* it was said: "We are not satisfied that this instrument, during the ten years that have elapsed since the decision in the Frye Case, has progressed from the experimental to the demonstrable stage. * * * While it may have some utility at present and may ultimately be of great value in the administration of justice, it must not be overlooked that a too hasty acceptance of it during this stage of its development may bring complications and abuses that will overbalance whatever utility it may be assumed to have."

In People v. Forte, 279 N. Y. 204, 18 N. E. 2d 31, 119 A. L. R. 1198, decided November 29, 1938, after all the evidence was adduced, defendant's counsel moved to reopen the case and that he be permitted to take defendant to a laboratory in another county, there to be examined under the pathometer, commonly known as a lie detector. In reviewing denial of the motion, it was said: "We cannot take judicial notice that this instrument is or is not effective for the purpose of determining the truth. Can it be depended upon to operate with complete success on persons of varying emotional stability? The

record is devoid of evidence tending to show a general scientific recognition that the pathometer possesses efficacy. Evidence relating to handwriting, finger printing and ballistics is recognized by experts as possessing such value that reasonable certainty can follow from tests. Until such a fact, if it be a fact, is demonstrated by qualified experts in respect to the 'lie detector,' we cannot hold as matter of law that error was committed in refusing to allow defendant to experiment with it."

It will be noted that the court therein simply concluded that it could not, in the absence of competent foundation evidence, take judicial notice as a matter of law, that the lie detector did or did not possess such general scientific recognition as to justify the admission of expert testimony deduced from tests made under such theory.

In People v. Becker, 300 Mich. 562, 2 N. W. 2d 503, 139 A. L. R. 1171, decided February 11, 1942, defendant offered the result of a polygraph or lie detector test made upon him, which, upon objection by the state, was refused admission. However, in sustaining the exclusion, it was said: "We see no reason why, under the circumstances of this case, the result should have been admitted. There was no testimony offered which would indicate that there is at this time a general scientific recognition of such tests. Until it is established that reasonable certainty follows from such tests, it would be error to admit in evidence the result thereof."

In the annotation, 139 A. L. R. 1174, speaking of the foregoing case, it was said: . "In this case, the test being offered by the defendant and objected to by the prosecuting attorney, the appellate court held that no error was committed in refusing to admit the results of the test in evidence. It should be observed that the court in this case, as is true of the court in People v. Forte (1938) 279 NY 204, 18 NE (2d) 31, 119 ALR 1198 (rehearing denied in (1939) 279 NY 788, 18 NE (2d) 870), merely held that such test was properly rejected in the absence of testi-

mony indicating a general scientific recognition of such a test. Had a proper foundation been laid for its introduction into evidence, it is conceivable that a different determination would have resulted."

In People v. Kenny, 3 N. Y. S. 2d 348, which People v. Forte, *supra*, did not overrule in principle, defendant prior to trial was subjected to a lie detector test at Fordham University under a modern triple-test machine similar to that at bar, designed for accurately testing human emotional reactions by graphically recording the increase or decrease of blood pressure, perspiration, and respiration of the subject while under examination.

In his defense, defendant offered the testimony as to the findings of the witness who asked the questions and operated the machine. Such witness was head of the Department of Psychology of the Graduate School of Fordham University, held a degree of doctor of physics from Georgetown University and one in philosophy from the Gregorian University. For seven years he was a professor of physiology at the Medical School of Georgetown University and had done extensive research work and private study in Europe, especially at the University of Vienna. His claim for scientific accuracy and reliability of the apparatus and tests resulting therefrom was based upon a study which covered more than 6,000 individual tests in which his findings were subsequently affirmed. He expressed the firm conviction, based upon evidence and investigations, that the tests, when properly employed upon those actually charged with crime, would prove 100 percent efficient and accurate in the detection of deception.

The state conceded the scientific value and practical utility of the apparatus and technique, but objected to evidence of its findings upon the grounds, among others, that the scientific principle involved in its use had not yet gone beyond the experimental and reached the demonstrable stage, and had not yet received general scientific acceptance. In doing so, the state relied upon

State v. Bohner, *supra,* and Frye v. United States, *supra,* both of which involved the results of simple systolic blood pressure tests as distinguished from the apparatus therein shown to have been perfected. The objection was overruled, and the court directed that the testimony should be received to be evaluated by the jury.

The opinion quoted from 2 Wigmore on Evidence (2d ed.), § 875, p. 237, App. 1, wherein it was said: " 'If there ever is devised a psychological test for the evaluation of witnesses, the law will run to meet it.' "

The opinion further said: "Objection to the use of scientific proof is not at all novel. At one time or another in their development testimony as to fingerprints, as to X-rays, as to handwriting, as to bullet markings and as to psychiatric examinations were all refused admission into evidence. * * * Their gradual admission into evidence came only after many rebuffs and rejections at the hands of various courts. Today their right to admission in evidence is firmly intrenched in our law. Yet the deductions of handwriting experts and of psychiatrists are not at all uniform, and we frequently have such experts testifying in our law courts and drawing conflicting inferences from their examinations. Despite the fact that such experts frequently differ in their conclusions, their testimony is received in evidence, and it is left to a jury to determine which, if either, expert or experts they are going to believe and accept. * * * Both upon legal principle and sound reasoning, it would seem that the courts, if willing to accept and receive handwriting testimony, psychiatric testimony and other such expert opinion, should also admit in evidence testimony of the pathometer test and the results disclosed thereby when a proper foundation has been laid therefor."

I agree that in the case at bar no sufficient foundation was laid to qualify the operator of the machine as an expert and that likewise no sufficient foundation was laid for admission of the exhibits demonstrating the recorded results of the tests to which defendant voluntarily

submitted upon request of county and state officials, who, as an inducement therefor, promised her a'release if the tests showed, as they concededly did, that she was telling the truth when denying her guilt.

However, I am convinced that if such a foundation were laid, as was done in People v. Kenny, *supra,* then the testimony of the operator and the results obtained by the tests would be admissible in criminal cases, such as that at bar, wherein defendant had voluntarily submitted to the tests. That complicated and difficult questions may arise therefrom in the trial of cases should be no reason for the exclusion of such evidence. Modern court procedure must embrace recognized modern conditions of mechanics, psychology, sociology, medicine, or other sciences, philosophy, and history. The failure to do so will only serve to question the ability of courts to efficiently administer justice.

Be that as it may, in the case at bar, while the operator of the machine was on the stand, defendant offered in evidence the recordings which concededly demonstrated that defendant was not guilty. The State's objection thereto for lack of foundation was sustained. Thereupon, without objection, defendant was called to the stand for the purpose of adducing further foundation evidence.

The record discloses that the State, upon cross-examination of her at that time, doubtless intended to and did adduce a reasonable inference that the tests showed affirmatively that defendant was guilty. The operator was then recalled, whereupon defendant offered to prove that the results of the tests given defendant showed a negative reaction upon questions and answers propounded in connection with the offense charged. Upon objection thereto by the State, the offer was refused.

In such a situation, defendant was entitled to rebut that inference by showing the true result of the tests, which indicated her innocence. The court's refusal to permit the admission of such evidence, as I view it,

was prejudicially erroneous. See Burlingim v. State, 61 Neb. 276, 85 N. W. 76, wherein it was held: "It is error to exclude evidence the legitimate tendency of which is to put an innocent complexion upon inculpatory circumstances proven by the state; the weight of such evidence is for the jury."

Therefore, I agree that the judgment should be reversed as was done by the majority opinion, but do not believe that upon a retrial the results of the lie detector test made upon defendant, under the circumstances in this case, should be excluded if a proper foundation is laid whereby it would be established that the operator was an expert in that field, and that the apparatus used and the tests made thereunder have been given general scientific recognition as having efficacy.

WENKE, J., concurring.

Although I am in accord with the conclusion reached by the majority that the judgment should be reversed and the cause remanded, I am not in accord with the basis adopted by the majority for arriving at that conclusion.

Under a factual situation as set forth in the majority opinion I do not believe the instruction given by the trial court was prejudicially erroneous. My reasons for disagreeing are sufficiently set out in my dissent in Schluter v. State, ante p. 284, 37 N. W. 2d 396.

However, for the reasons stated in the concurring opinion of Judge Chappell, with which I am in full accord, the conclusion arrived at by the majority is, in my opinion, the proper one.

CARTER, J., joins herein.