**STATE of Maine**

v.

**Thomas WILLIAMS.**

Supreme Judicial Court of Maine.

July 10, 1978.

Joseph M. Jabar (orally), Dist. Atty., Augusta, for plaintiff.

O'Gara & Harrington by Emmet J. O'Gara, Winthrop (orally), for defendant.

Before McKUSICK, C. J., and POMER-·OY, WERNICK, ARCHIBALD and GODFREY, JJ.

WERNICK, Justice.

On May 26, 1976, defendant Thomas Williams was indicted in the Superior Court (Kennebec County) for the offense of terrorizing, in violation of 17–A M.R.S.A. § 210. A jury found defendant guilty as charged, and he has appealed from the judgment of conviction entered on the verdict.

We deny the appeal.

On May 20, 1976, an unidentified person made a telephone call to a dispatcher at the Augusta Police Department and stated that a bomb was going to go off at the Augusta State Airport. While the call was in process, the Augusta police recorded it on magnetic tape. Thereafter, Officer Richard Gary Judkins of the Augusta Police Department listened to the tape recording and recognized the voice of the person telephoning as the voice of defendant. Later that day, at the request of the police, defendant came to the Augusta police station and read aloud a rough transcript of the threatening telephone call previously received and recorded at the police station. With defendant's agreement, a tape recording was made of defendant's reading. The police thereafter submitted both the tape recording of the threatening telephone call and of defendant's reading to Dr. Oscar Tosi of Michigan State University and Lieutenant Lonnie Smrkovski of the Michigan Department of State Police, each to make a voice identification analysis through the use of a speech spectrograph.

At trial, Dr. Tosi gave preliminary testimony as to the nature, reliability and scientific acceptance of the "scientific" voice identification process known as speech spectrography or "voiceprint" analysis. Dr. Louis J. Gertsman, of City College in New York, and Faulsto Poza, a consultant to the Stanford Research Institute, testified, preliminarily, in opposition to allowing in evidence testimony as to voice identification achieved by the use of speech spectrography.

At the conclusion of the extensive preliminary testimony the presiding Justice ruled, over defendant's objection, that adequate foundation had been shown to satisfy him that (1) voiceprint identification has such scientific acceptance and reliability as warrants its admissibility in evidence, (2) the experts whose opinions were here being sought as evidence were qualified to assist the jury in its determinations.

Thereafter, Dr. Tosi and Lt. Smrkovski testified that through use of a speech spectrograph each of them had independently analyzed the voices recorded on the two tapes and had independently made a "positive identification" that the unknown voice from the telephone call and the known voice of the defendant belonged to the same person. Officer Judkins then testified that he had recognized defendant's voice when he had listened to the recording of the bomb threat.

Defendant's position on appeal is that it was error to admit the speech spectrograph evidence because the scientific community has not generally accepted the speech spectrograph as a scientifically reliable method of voice identification. Defendant further contends that in any event speech spectrograph voice identification evidence is unreliable in forensic situations.

1.

The threshold question we confront is to determine what standard, under the law of evidence, governs *admissibility* in relation to the type of evidence here involved.

The preliminary evidence of record shows that the process of voice identification used by Dr. Tosi and Lt. Smrkovski consists of an aural comparison of two recorded voices and a visual comparison of graphic representations or "spectrograms" of the recorded voices. The spectrograms used in the visual comparison process are plotted by a machine known as a spectrograph. The spectrograph separates the sounds of a voice into elements of time, frequency and intensity and plots these variables on electronically sensitive paper.[1] Since the spectrograms of the voice of a person often vary over time and under a variety of conditions and circumstances, the accuracy of the spectrogram voice identification process is largely dependent on the ability, experience and judgmental consistency of the examiner. There is no dispute that for most of the 20th century the sound spectrograph has been widely resorted to for the analysis

1. The horizontal axis of the spectrogram represents the time lapse of each sound, the verticle axis indicates frequency and the thickness of the lines discloses the intensity of the voice.

and classification of human speech sounds, but it had not been used to identify individual human voices until the early 1960's when Lawrence Kersta, a scientist with the Bell Telephone Laboratories, undertook such projects. Thereafter, Dr. Tosi conducted a number of significant experiments in individual voice identification with the use of the speech spectrograph. The publication in 1971 and 1972 of the results of these experiments and expert testimony given in cases by Dr. Tosi and his associates have induced many courts to allow as evidence individual voice identifications made by use of speech spectrographs.

Defendant argues that speech spectrograph voice identification rests on new developments in the application of scientific principles and therefore its admissibility as evidence should be governed by a special standard, as set forth in *Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923):

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable · stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

Prior to the adoption of the Maine Rules of Evidence in 1976, the law of Maine was unclear about the evidentiary rules governing the admissibility of evidence involving the new ascertainment, or application, of scientific principles. In *State v. Knight,* 43 Me. 11, 133, 134 (1857), the Court upheld the admissibility of scientific testimony as to the properties and appearance of human blood and animal blood. *Knight* gave the following rationale:

"The history of the development of scientific principles by actual experiments, within a few of the last years, show[s] us that many things which were once regarded generally as incredible, are now admitted universally to be established facts. And as long as the existence of facts, which are the result of experiments, made by those versed in the department of science to which they pertain, are received as evidence, it would be legally erroneous for the court to determine that the absurdity of such facts was so great as to require their exclusion." (43 Me., at 133, 134)

It is questionable from this language whether *Knight* was suggesting a special standard, such as is stated in *Frye,* supra, to govern the admissibility of expert testimony resting on newly ascertained, or applied, scientific principles. More recently, this Court may have given stronger indication of following the *Frye* rule in regard to evidence of the results of lie detector or polygraph tests. Holding polygraph evidence generally inadmissible, this Court in *State v. Casale,* 150 Me. 310, 320, 110 A.2d 588 (1954) resorted to language contained in the Nebraska opinion in *Boeche v. State,* 151 Neb. 368, 37 N.W.2d 593, 597 (1949), as follows:

" 'It is apparent from the foregoing authorities that the scientific principle involved in the use of such polygraph has not yet gone beyond the experimental and reached the demonstrable stage, and that it has not yet received general scientific acceptance.' "

See also *State v. Mower,* Me., 314 A.2d 840 (1974); *State v. Mottram,* 158 Me. 325, 184 A.2d 225 (1962).

The reference to a special standard of admissibility in *Casale,* however, was occasioned by the peculiarly special nature of lie detector tests as evidence.[2] Lie detector evidence directly and pervasively impinges upon that function which is so uniquely the prerogative of the jury as fact-finder: to decide the credibility of witnesses. The admissibility of lie detector evidence therefore poses the serious danger that a mechanical

---

**2.** The *Frye* case also involved the exclusion of polygraph evidence.

device, rather than the judgment of the jury, will decide credibility. *State v. Casale,* 150 Me. 310, 320, 110 A.2d 588 (1954). For this reason, it remains questionable whether this Court by its language in *Casale* was purporting to establish a specially restrictive standard regarding the admissibility of *any* type of expert testimony which may rest on new, or new applications of, scientific principles.

The Maine Rules of Evidence adopted in 1976 do not purport to establish a special standard to govern the admissibility of testimony involving newly ascertained, or applied, scientific principles. Under the Rules of Evidence all "relevant" evidence [3] is admissible

> "except as limited by constitutional requirements or as otherwise provided by statute or by . . . rules applicable in the courts of this state." Rule 402, M.R.Evid.

In Rule 702, specific reference is made to the admissibility of scientific testimony:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

As also potentially affecting a case of this nature, Rule 403 provides a general limitation on the admissibility of relevant evidence:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

---

3. "Relevant" evidence is defined in Rule 401 to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

4. We reach this conclusion, too, because of the difficulties experienced by courts in applying the *Frye* rule. As explained in McCormick on

Defendant's argument relies on the fact that the Rules of Evidence do not deal *specifically* with the admissibility problem as it may arise by virtue of newness in the development, or application, of scientific principles. Defendant asks us to fill this gap by establishing an additional precondition of admissibility as applicable *specially* to the situation in which proffered expert testimony will rest on a new ascertainment, or new application, of scientific principles— this further condition to be that there must be "general acceptance" of such newly discovered scientific principle, or new application of scientific principle, in the relevant scientific field.

We refuse to take the course for which defendant argues. We believe it would be at odds with the fundamental philosophy of our Rules of Evidence, as revealed more particularly in Rules 402 and 702, generally favoring the *admissibility* of expert testimony whenever it is relevant and can be of assistance to the trier of fact.[4] As stated in McCormick on Evidence § 203 at 491 (2d ed. 1972):

> " 'General scientific acceptance' is a proper condition for taking *judicial notice* of scientific *facts*, but not a criterion for the *admissibility* of scientific *evidence*. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, and undue consumption of time." (emphasis supplied)

■ In accordance with the provisions, and basic spirit, of our Rules of Evidence in regard to the admissibility of expert testimony, we conclude that there is no justifia-

---

Evidence § 203 at 490 (2d ed. 1972): "The difficulty of determining how to distinguish scientific evidence from other expert testimony, of deciding what is the particular field of science to which the evidence belongs, and of settling what is general acceptance, has led to an application of the . . . [Frye] test which is highly selective, although not enlightening as to its details."

ble distinction in principle arising because such expert testimony may happen to involve newly ascertained or newly applied scientific principles. The controlling criteria regarding the admissibility of expert testimony, so long as the proffered expert is qualified and probative value is not substantially outweighed by the factors mentioned in Rule 403, are whether in the sound judgment of the presiding Justice the testimony to be given is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue. ·

In particular cases where the expert testimony proffered rests on newly ascertained, or applied, scientific principles, a stronger showing may become necessary before the presiding Justice is satisfied that the preconditions of admissibility, in terms of relevance and helpfulness to the factfinder, have been met. Thus, in the particular circumstances of a given case the presiding Justice may see fit to place greater emphasis on the consideration whether or not the scientific matters involved in the proffered testimony have been generally accepted or conform to a generally accepted explanatory theory. Cf. *United States v. Baller*, 519 F.2d 463, 466 (4th Cir. 1975) and *United States v. Brown*, 557 F.2d 541, 556 (6th Cir. 1977). The Justice may believe this appropriate either (1) to avoid prejudice which might arise because the assertion that the principle, or technique, has a "scientific" basis may import an objectivity which could unduly influence the jury as a lay fact-finder or (2) to assist the presiding Justice in his responsibility to determine relevance, within the definition of Rule 401 M.R.Evid., i. e., whether the proffered testimony is likely to make the existence of any fact or consequence more probable or less probable than it would be without the evidence.

This, however, is not the same as saying, as does the *Frye* rule, that the presiding Justice is *bound* by an additional, *independently controlling* standard which exists over and above relevance (Rule 401 M.R. Evid.) and the capability of the expert testimony to assist the trier of fact (Rule 702

M.R.Evid.). On the approach we adopt the presiding Justice will be allowed a latitude, which the *Frye* rule denies, to hold admissible in a particular case proffered evidence involving newly ascertained, or applied, scientific principles which have not yet achieved general acceptance in whatever might be thought to be the applicable scientific community, if a showing has been made which satisfies the Justice that the proffered evidence is sufficiently reliable to be held relevant. Cf. *United States v. Franks*, 511 F.2d 25, 33 (6th Cir. 1975).

### 2.

With the criteria of admissibility thus decided, we address whether the presiding Justice committed error, here, by admitting the spectrograph testimony in evidence.

Dr. Tosi's testimony related to the nature of the human voice and the spectrograph process, the results of his experiments and the reliability of the spectrograph voice identification process. Simultaneously, however, Dr. Tosi was careful to explain that the spectrograph voice identification process is not infallible. According to Dr. Tosi, the reliability of the spectrograph voice identification method is highly dependent on the experience, ability and judgment of the person who makes the spectrograph comparisons.

Testimony was also given by acoustical scientists who oppose the use of spectrograph as evidence. In their view, (1) the examiners of spectrographic data cannot maintain firm and stable criteria of decision; (2) they may tend to relax their threshold standards for making a "positive identification", in particular where only a single sample voice exemplar is presented for comparison with the known voice; and (3) the spectrograph experiments generally have not accounted for many variables such as telephone recordings, disguised voices, noncontemporaneous recordings, background noise and voices of persons under psychological stress.

Yet, none of the acoustical scientists who testified questioned as facts that recordings of different human voices vary more in

time, frequency and intensity than recordings of the same voice and that the spectrograph can accurately plot these variables. The opposition experts focused only on the difficulties of comparison and the exercise of judgment and the failure of the spectrograph experiments to account for many real world variables.

█ In view of the evidence of reliability presented by Dr. Tosi, we conclude that it was not error for the presiding Justice to admit the expert voice identification testimony in this case. The Justice was justified in finding that the spectrograph principle was sufficiently reliable to qualify as "relevant" within the definition of Rule 401 M.R.Evid., and that the qualified expert testimony based on it could be of assistance to the jury as fact-finder.

The issue raised by defendant regarding the application of the spectrograph process to forensic situations concerns the weight, not the admissibility, of the evidence [5] and was exclusively for the jury's determination.

The entry is:

Appeal denied.

Judgment affirmed.

DELAHANTY, J., did not sit.

NICHOLS, Justice (concurring in the judgment).

I concur in the judgment.

I cannot, however, join in the opinion of the Court this day because I believe it retreats too far from the position often taken—and well taken—by this Court that before we recognize the evidential force of new applications of scientific principles, these should have attained general acceptance in the scientific community.

This standard of "general acceptance" was recognized by the Court of Appeals of the District of Columbia in *Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923), in which a systolic blood pressure deception test was held to have been properly excluded from evidence.

When our Court had occasion to reject evidence of a polygraph test in *State v. Casale,* 150 Me. 310, 320, 110 A.2d 588 (1954), it quoted from the opinion of the Nebraska court in *Boeche v. State,* 151 Neb. 368, 37 N.W.2d 593 (1949). There the Nebraska court had expressly relied upon *Frye.*

When eight years later our Court in *State v. Mottram,* 158 Me. 325, 329, 184 A.2d 225 (1962) reaffirmed that evidence of the results of "lie detector tests" was inadmissible, the lack of general acceptance of the results of such tests was again the determinative factor.

---

**5.** A number of courts in other jurisdictions have admitted spectrograph evidence either on the basis of the general acceptability test of *Frye* or on the basis of some type of reliability standard. See, e. g., *United States v. Jenkins,* 525 F.2d 819 (6th Cir. 1975); *United States v. Baller,* 519 F.2d 463 (4th Cir. 1975); *United States v. Franks,* 511 F.2d 25 (6th Cir. 1975). *United States v. Sample,* 378 F.Supp. 44 (E.D. Pa.1974) (probation revocation proceeding); *United States v. Wright,* 17 U.S.C.M.A. 183, 37 C.M.R. 447 (1967); *Hodo v. Superior Court,* 30 Cal.App.3d 778, 106 Cal.Rptr. 547 (1973); *Worley v. State,* 263 So.2d 613 (Fla.App.1972); *Alea v. State,* 265 So.2d 96 (Fla.App.1972); *Reed v. State,* 35 Md.App. 472, 372 A.2d 243 (1977); *Commonwealth v. Lykus,* 367 Mass. 191, 327 N.E.2d 671 (1975); *State ex rel. Trimble v. Hedman,* 291 Minn. 442, 192 N.W.2d 432 (1971) (probable cause hearing); *People v. Rogers,* 86 Misc.2d 868, 385 N.Y.S.2d 228 (1976); *State v. Olderman,* 44 Ohio App.2d 130,

336 N.E.2d 442 (1975). Some courts, relying primarily on the *Frye* rule, have excluded spectrograph evidence because of the substantial opposition to it of many acoustical scientists. See, e. g., *United States v. Addison,* 162 U.S. App.D.C. 199, 498 F.2d 741 (1974) (but see *United States v. McDaniel,* 176 U.S.App.D.C. 60, 538 F.2d 408 (1976) where the Court noted that it may be time to reexamine *Addison* ); *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976); *People v. Law,* 40 Cal. App.3d 69, 114 Cal.Rptr. 708 (1974) (disguised voices); *People v. King,* 266 Cal.App.2d 437, 72 Cal.Rptr. 478 (1968); *People v. Tobey,* 401 Mich. 141, 257 N.W.2d 537 (1977); *State v. Cary,* 56 N.J. 16, 264 A.2d 209 (1970) (but see *State v. Andretta,* 61 N.J. 544, 296 A.2d 644 (1972) where the Court suggested that reconsideration of *Cary* was appropriate in view of new developments in speech spectrography); *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977).

Even more recently when in *State v. Mower,* Me., 314 A.2d 840, 841 (1974) our Court ruled that evidence of the defendant's willingness to take a polygraph test was properly excluded, it reiterated the language of *Mottram*.[1]

Such was the state of the law in this jurisdiction when in 1976 the Maine Rules of Evidence, modeled after the Federal Rules of Evidence, were promulgated. Rule 702, M.R.Evid., relates generally to testimony by experts without addressing specifically the question of new application of scientific principles. This rule was regarded by the Advisers, not as relaxing the standards of admissibility, but as declaratory of Maine law. Advisers' Note, M.R.Evid. 702. A rule intended as a codification of existing law, however, is today being employed to change that law.

We should continue to adhere to the *Frye* standard. It is not merely because such has been the law in this jurisdiction. It is not merely because the *Frye* standard continues to be applied in many federal courts notwithstanding the promulgation of Federal Rules of Evidence. *United States v. McDaniel,* 176 U.S.App.D.C. 60, 65, 538 F.2d 408, 413 (1976); *United States v. Brown,* 557 F.2d 541, 557 (6th Cir., 1977); *United States v. Kilgus,* 571 F.2d 508 (9th Cir., 1978). Rather, it is because there are good reasons why each new scientific technique should not become the basis for expert testimony as quickly as the expert can persuade the court that it will assist the trier of fact to understand the evidence or to determine a fact in issue.

To adhere to the *Frye* standard of requiring general—but not universal—acceptance within the scientific community will enhance the fairness of the trial, especially in criminal cases. It will avoid the difficulty of rebutting the expert's opinion except by other experts or by cross-examination grounded upon a thorough acquaintance with the novel application of scientific principles. This burden of rebuttal is generally borne in these criminal cases by defendants without the economic means to marshal scientific witnesses for a battle of the experts.

As was observed in *United States v. Brown, supra,* 557 F.2d at 556, the fate of a defendant should not hang on his ability to rebut scientific evidence when the expert may be testifying upon the basis of an unproved hypothesis arrived at in an isolated experiment. It is far better that the expert first expose his new ideas to the critical review of his peers. The courtroom, after all, is not a laboratory. *Id.*

Furthermore, adherence to the *Frye* standard would result in more uniformity within our trial courts than if scientific evidence may come in whenever the trial judge decides it is relevant and concludes it will help to determine a factual issue.

Moreover, the litigants would be protected by a clearer standard of review.

Finally, it would avoid the risk that, by announcing a lesser standard, the door may inadvertently be opened to pseudo-scientific expertise.

As acknowledged by the majority, a number of courts have admitted spectrographic evidence without abandoning the *Frye* standard. E. g., *United States v. Baller,* 519 F.2d 463, 465–466 (4th Cir.) *cert. den.* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975); *Commonwealth v. Lykus,* 367 Mass. 191, 327 N.E.2d 671, 674–676 (1975). There is sufficient basis in those cases to uphold the admission of spectrographic evidence in the trial of the instant case without abandoning the important protections which *Frye* affords.

---

1. I do not accept the suggestion that the *Frye* standard is "occasioned by the peculiarly special nature of lie detector tests as evidence," because it may impinge upon the jury function of resolving questions of credibility. While *Frye* involved an early version of the polygraph, the *Frye* standard has been generally applied to situations involving application of new scientific principles. E. g., *United States v. Brown,* 557 F.2d 541 (6th Cir., 1977) (ion microprobic analysis of hair samples); *United States v. Kilgus,* 571 F.2d 508 (9th Cir., 1978) (forward looking infrared system); *People v. Lauro,* 91 Misc.2d 706, 398 N.Y.S.2d 503 (Sup. Ct., 1977) (trace metal detector).

See Comment: Evidentiary Use of the Voice Spectrograph in Criminal Proceedings, 77 Mil.L.Rev. 167 (1977).

For our Court as well, I submit that such adherence to the *Frye* standard would be the better course.