STATE OF MAINE
HANCOCK, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-01-17

Melody Naegel et al.,
    Plaintiffs

v.

Decision and Judgment

Progressive Casualty Ins. Co.,
    Defendant

MAR 1 2003

In this action, the plaintiffs seek recovery under the underinsured motorist provisions of the automobile insurance policy they purchased from the defendant. By agreement of the parties, the trial record in this jury-waived proceeding consists of the depositions of the plaintiffs, Dr. Peter Just (who treated Melody Naegel) and Dr. Phillip Kimball (who performed an independent medical examination on Ms. Naegel). The parties submitted the written transcripts of those depositions and videotapes of three of them (those of Ms. Naegel and the two physicians), which were taken as a substitute for the live court testimony. The trial record also consists of a notebook of medical records and bills. Additionally, the parties have submitted written argument on the admissibility of Dr. Just's testimony, oral argument on that issue and final oral summation on the overall claim. The court has reviewed and considered all of this material, including the videotapes.[1]

This case arises out of a motor vehicle collision that occurred in 1999. The plaintiff Melody Naegel was operating her motor vehicle on route 1 in Hancock and was struck from behind by a vehicle driven by one Damien Walston. Here, the defendant does not contest the plaintiffs' allegations that Walston operated his vehicle negligently. There is no claim that Ms. Naegel was comparatively negligent. The parties also agree

---

[1] The court commends and thanks counsel for their efforts and cooperation in creating the trial record in this way.

1

that there are no questions regarding the existence of underinsured motorist coverage that would be applicable here if the plaintiffs establish damages in excess of the amount of their settlement with the tortfeasor. Therefore, the disputed issues generated by the evidence in this case consist of the nature of the injuries caused by Walston's negligence and the extent of damages established by the plaintiffs, including Mr. Naegel's consortium claim.

On November 10, 1999, the vehicle operated by Walston struck the rear of the vehicle driven by Ms. Naegel two times. The second impact forced Naegel's car off of the road. Her head struck the head rest on her seat but she did not lose consciousness. She was transported by ambulance to a local hospital, where she was evaluated. She reported no neck pain but had some general soreness. She was diagnosed with multiple muscle strains. Although she did not experience neck or upper back pain immediately, that type of pain set in over the next 48 hours. As a result, she sought treatment at a family practice clinic. The family nurse practitioner who examined Naegel concluded that she had "[w]hiplash injury, cervical neck strain" and referred her for physical therapy and chiropractic care.

Naegel began physical therapy on November 15, 1999, and she continued that course of treatment until the end of December 1999, when she chose to stop that treatment because she was dissatisfied with the results. The goal of physical therapy, as formulated at the outset of that treatment, was the elimination of pain in six to eight weeks. The two physicians involved in this case both testified that typically, a patient with cervical soft tissue injuries puts pain behind her within six months of the date of injury. The court places weight on the physical therapy progress notes in accounting for Naegel's ongoing condition from mid-November through the end of December 1999. Those records suggest a progression of improvement and healing greater than that acknowledged by Naegel herself. Nonetheless, the court finds the contemporaneous records to be more reliable in charting her progress over that time period. The pattern of progress noted in those records is too consistent and long-term to be discounted as Naegel attempts to do.

Those records in fact demonstrate that Naegel's cervical condition improved considerably – although not fully – up to the end of 1999. For example, as early as

2

November 17, her injuries were reportedly "[r]esolving," to the extent that the intensity of her physical therapy treatment would be increased. On November 22, her pain had "[i]mproved," and Naegel herself reported, "I think I'm doing better." Two days later, she reported that she was "better" and "more limber," and she was felt to have improved. In late November, she returned to the medical clinic for followup on her injuries. There, she was reported to feel "almost completely recovered. . .," although she would feel a "slight neck strain" when she moved in a particular way. At her last physical therapy session in November, she advised that she felt "pretty good" but had a "non-severe" shoulder pain when she rotated her neck and upper back.

The reports of Naegel's physical therapy sessions in December reveal continuing and steady progress during that month. On December 6, she reported that she "[f]eels better," and the physical therapist concluded that she had improved subjectively and objectively. There was, however, still some discomfort and limitation in her ability to move her cervical spine. Three days later, Naegel reported an improved range of motion but still some pain. She was diagnosed with "resolving soft tissue injuries." She was reevaluated more comprehensively by her physical therapist in mid-December. That report shows that Naegel had improved considerably but still was assigned a goal of freedom from pain six to eight weeks thereafter, which is the same goal she had one month earlier. This constitutes evidence that, on the one hand, she was in better condition than when she began that therapy, but she still had more progress to achieve – although she was still well within the typical six month rehabilitation period suggested by the physicians in this case. During the final two weeks when Naegel chose to continue physical therapy, she again reported a reduction in pain. Near the end of the month, she was reported to be frustrated that the pain still bothered her. Nonetheless, even on her final physical therapy session, she was still assessed to have a "[r]esolving soft tissue injury."

Despite this reported consistent progress and the projected goals set out in the mid-December evaluation, Naegel elected to terminate her physical therapy treatment. During much of the time when she was in physical therapy, Naegel also received chiropractic treatments, as the nurse practitioner at her medical clinic had recommended.

3

She felt that she failed to make progress with the chiropractor, and she therefore terminated that form of therapy in early January.

Shortly after Naegel stopped her chiropractic and physical therapy treatments, she was examined and evaluated by Peter Just, M.D. Dr. Just ultimately diagnosed Naegel with an injury to one or more of her facet joints in her cervical spine, and he performed a radio frequency cervical facet neurotomy on Naegel.[2] The defendant has objected to the admission of Dr. Just's testimony, arguing that evidence of his diagnosis and treatment is not competent and admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). The court does not reach the question of whether evidence of Dr. Just's diagnosis and care of Naegel is formally admissible because, even if it is, the court would not attach weight to that evidence for the same reasons used by the defendant in arguing for its exclusion. Thus, the *Daubert* analysis is implicated here, whether the issue is framed as one of admissibility or weight.

The analysis in *Daubert* must be examined in light of controlling law in Maine, which is best embodied in *State v. Williams,* 388 A.2d 500 (Me. 1978), construing M.R.Evid. 702. In *Williams,* the Law Court held that the ultimate test for the admissibility of expert testimony is whether that testimony "is relevant and will assist the trier of fact to understand the evidence or to determine a fact in evidence." 388 A.2d at 504. (This examination assumes that the proffered witness is qualified to render an opinion.) The Court expressly rejected as a foundational predicate a showing that the scientific principles underlying the opinion must be generally accepted in the relevant scientific community. *Id.* In this way, properly grounded and legitimately defensible expert opinions may be submitted for consideration by the trier of fact if that evidence will be of assistance to that judge or jury, even if the underlying theory or principle is novel. *Id.* To be relevant, that evidence must be "sufficiently reliable." *Id.* One of the

---

[2] A radio frequency cervical facet neurotomy is a procedure in which a radio current is transmitted through a nerve. The radio current creates heat, and the heat coagulates the nerve. In essence, the nerve is interrupted and thus cannot transmit pain. In this way, the procedure is a pain management technique rather than a cure of the underlying physiological condition. Indeed, the interrupted nerves can regenerate, sometimes prompting additional neurotomies. Naegel has undergone this procedure twice – once performed by Dr. Just in April 2000, and a second performed out of state in December 2001.

4

significant consequences of *Williams* is that it vests considerable flexibility and discretion with the court when it must rule on the admissibility of scientific evidence. The Williams Court discounted the rather rigid Frye test of general acceptance within the scientific community.

When *Williams* is viewed in this way, this court sees very little – if any – daylight between the analyses in *Williams* and *Daubert*. *Daubert* made clear, as the *Williams* Court did previously, that admissibility of scientific testimony is not governed by its general acceptance in the scientific community. 509 U.S. at 589. Rather, scientific evidence is admissible if it is relevant and reliable. *Id.* Both of these considerations flow from the more general principle that such evidence must have the capacity to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591; *see* Fed.R.Evid. 702. Again, this tracks the *Williams* analysis. The Supreme Court then went on to identify several factors that the trial court should consider in determining the admissibility of scientific evidence. These factors, which are not exhaustive, flow directly from the notion of reliability. 509 U.S. at 593. Although *Williams* did not go so far as to set out the sub-inquiries found in *Daubert*, the principle and the purpose of the *Williams* inquiry are the same. The considerations noted by the Supreme Court include whether the scientific principle or technique can be tested; whether the principle or technique has been subject to peer review; the magnitude of the error rate; the existence and maintenance of standards controlling the technique; and general acceptance of the theory or technique in the relevant scientific community. *Id.* at 593-94.

Here, using the analysis set out in *Williams* and developed further in *Daubert*, the court concludes from this record that the plaintiff has failed to prove that Dr. Just's diagnosis and treatment are sufficiently reliable to give it meaningful weight, at least as that evidence is applied to Ms. Naegel's condition. Problems affect both the diagnostic and treatment aspects of a radio frequency cervical facet neurotomy. Dr. Just testified that that procedure is used to treat patients who have an injury to a facet joint of the spine. Therefore, the treating physician must first diagnose a facet joint injury. Dr. Just testified that a facet joint injury cannot be diagnosed; rather, it can only be suspected. (Just deposition transcript at 28-29.) However, as Dr. Just also acknowledged, there do exist diagnostic tools, such as an MRI, that are available to detect facet joints. (*Id.* at 15.)

The plaintiff did not undergo an MRI or any other procedure that might have revealed her condition. (In fact, as Dr. Kimball pointed out, Naegel had never undergone a comprehensive medical examination by a physician in connection with the injuries she sustained in the 1999 accident.) Rather, Dr. Just felt that the information that could be obtained by an MRI would be "confus[ing]." *Id.* at 73. During the independent medical examination, Dr. Kimball found no evidence of a facet joint problem.

This diagnostic uncertainty creates the separate problem of identifying which patients are appropriate candidates for the procedure. Because the procedure is designed to address a particular physiological condition, if that condition cannot diagnosed with confidence, the procedure might not be applied to the proper circumstance. As a corollary to this, Dr. Just testified that he would not use the neurotomy procedure on a patient who was making progress with other therapies. In fact, the persuasive evidence in this case demonstrates that Naegel in fact was making such progress through physical therapy. Further, Dr. Just is inclined not to perform this procedure on a patient who had a significant emotional entanglement (such as significant anxiety, apprehension or hostility) with the situation. The records demonstrate that Naegel was such a person. In light of these criteria of patient selection, this evidence raises a substantial question of whether the neurotomy procedure was suited for Naegel and whether she had an actual problem with a facet joint.

There is no meaningful evidence that the radio frequency cervical facet neurotomy procedure has been subjected to peer review scrutiny. Even beyond this, there is no evidence of *any* literature on cervical facet neurotomies, although such literature exists regarding neurotomies on other portions of the spine. (*Id.* at 27.)

The procedure is an unusual one. Dr. Just himself (at least as of the date of his trial deposition) had performed less than twelve, and he knows of no other physicians who perform that technique. Its controversial status in the medical community – demonstrated at the very least by its infrequent use -- makes it difficult to conclude that it has received general acceptance.

In at least two ways, the nature of the procedure makes it difficult to review and test its efficacy. First and most importantly, the cervical facet neurotomy results in the interruption of nerves that are located at a number of levels of the spine. The treating

6

physician cannot be more precise during the procedure because it is difficult to know which level is the source of the patient's pain. Thus, as the procedure is described in this record, it is a shotgun approach, which, as Dr. Just himself acknowledges, is "unscientific." (*Id.* at 34.) Second, the success rate is 50% (*id.* at 8): half the time it works, and half the time it does not work. This also makes it difficult to determine whether any results are caused by the procedure or some other circumstance.

Finally, as part of the diagnostic process, the physician performs a separate procedure of anaesthetizing or blocking nerves in the injured area. There do not appear to be any standards for that procedure. There are wide variations among practitioners regarding the number of vertebral nerves that they block and the number of times they repeat the process. Dr. Just takes a middle ground. This component of the neurotomy process is further clouded because it has a significant placebo effect on the patient (*id.* at 29-30.), further complicating any effort to assess the validity and reliability of the technique and its underlying theory.

Dr. Just performed the neurotomy in mid-2000. After the procedure, Naegel experienced relief. It is important to note, however, that that is the time when, as a general matter, a patient who sustains the soft tissue injury with which the plaintiff was originally diagnosed, would be mostly or fully recovered. A fatal logical flaw affects Naegel's causation analysis. The core of her argument is that because Dr. Just performed the cervical facet neurotomy and gained relief after that procedure, the procedure must have addressed the cause of the problem. However, this post hoc argument is weakened by a number of factors, many of which are outlined above. For example, other means to detect a facet injury were either not used or, when used, did not reveal that problem. In other words, it is quite unclear whether Naegel had an injury to the facet joint. Also, there is a substantial question of whether Naegel was a proper candidate for that procedure. The theory underlying the technique is subject to considerable doubt. Reliable medical records demonstrate that Naegel was recovering nicely from her injuries and, when viewed against the experience of many other similarly injured persons, was on track for a full recovery at the time Dr. Just performed the neurotomy on her, even if that procedure had not been used.

For these and the other reasons discussed in this order, the court concludes that the plaintiffs have failed to prove that Naegel sustained anything other than a soft tissue injuries to her neck and upper back and to the lower back. These injuries were not permanent and were largely resolved within several months of the accident, and then fully resolved by the middle of 2000.

Based on these findings, the court further concludes that Naegel's medical bills resulting from her initial treatment, from MedNow, from Bay View Physical Therapy and from Dr. Nesiba (the chiropractor) are reasonable and causally related to the accident. These medical expenses amount to approximately $2,900. Naegel has not proven that she is entitled to recovery for bills associated with other medical providers.

Ms. Naegel's injuries limited her activities for several months, and she certainly experienced ongoing, but diminishing pain.

From this, the court concludes that Ms. Naegel has established compensatory damages in the total amount of $15,000.

Her husband, Stephen Naegel, seeks an award for loss of his wife's consortium. The evidence shows that Ms. Naegel's injuries had an effect on her and therefore on her marriage. However, the magnitude of that impact is diminished because, even prior to the accident, Mr. Naegel, who was retired, had a significant role in managing the household. Thus, his wife's physical limitations caused by the injuries did not require the parties to restructure the allocation of their responsibilities. Additionally, the extent of the injuries attributable to the accident is limited, and thus any damages generated by the consortium claim are correspondingly reduced. The court assesses Mr. Naegel's damages at $2,500.

At trial, the parties stipulated that the amount of the Naegels' settlement with the tortfeasor was $50,000. This recovery was well in excess of the amount of damages determined here. Accordingly, the plaintiffs have failed to prove that they are entitled to further recovery from the defendant under the underinsured motorist provisions of their insurance policy.

The entry shall be:

8

For the foregoing reasons, judgment is entered for the defendant. The defendant is awarded its costs of court.

Dated: January 11, 2003

_____
Justice, Maine Superior Court

FILED &
ENTERED

JAN 1 3 2003

SUPERIOR COURT
HANCOCK COUNTY

9